UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GERARD R. MARCOTTE,

    Plaintiff,

v.

MONROE CORRECTIONS COMPLEX, et al.,

    Defendants.

NO. C04-1925JLR

ORDER

## I.   INTRODUCTION

This matter comes before the court on a motion for summary judgment by Defendants[1] (Dkt. # 36). For the reasons stated below, the court GRANTS in part and DENIES in part Defendants' motion.

## II.   BACKGROUND

Plaintiff Gerard Marcotte suffered a stroke while incarcerated at the Monroe Corrections Complex ("MCC"). He filed suit against the facility, a state agency, and various MCC employees alleging that Defendants violated his Eighth Amendment rights when they

---

[1] Defendants include the Monroe Corrections Complex, Washington State Department of Corrections, Robert Moore, John Kenney, John Loranger, Rosemary Fitzer and various Doe Defendants not yet identified.

ORDER- 1

denied and delayed adequate medical treatment.  Marcotte also alleges state tort claims for medical malpractice, negligent supervision, and outrage.

On June 12, 2001, John Loranger ("Loranger"), an MCC certified physician-assistant, examined Marcotte after he complained of shaking, sweating, weak knees, numbness in his thighs and a visual aura of black and silver spots.  Marcotte reported to Loranger that he had experienced similar, milder episodes in the past.  Loranger took Marcotte's blood pressure as he had done eight days earlier in an unrelated examination.  Plaintiff provides evidence that his blood pressure registered very high on both occasions: 189/96 and 154/94, respectively.  Vertetis Decl., Exhs. 9, 10.  Indeed, MCC staff had previously diagnosed Marcotte with high blood pressure and prescribed Atenolol, an anti-hypertension drug.  Loranger's evaluation also indicated a right side carotid bruit (an abnormal noise in the carotid artery).  Loranger ran lab tests to rule out the possibility that Marcotte had suffered a transient ischemic attack (a mild stroke).  Loranger concluded that Marcotte had not suffered a mild stroke despite test results showing high cholesterol and a high low-density lipoprotein ("LDL") count, and notwithstanding Marcotte's medical history of high blood pressure, tobacco use, and diabetes.  Defendants state that "no effort was made to follow up with [Marcotte] on the part of the medical staff."  Defendants claim that Loranger's treatment was adequate.  Concurrently, Defendants argue that "all Marcotte had to do" – presumably to avoid a stroke – was follow up with Loranger and continue taking his Atenolol.  If Marcotte had made an appointment and returned to the infirmary, Defendants claim, Loranger would have shared the test results with him and conducted further evaluations if needed.

Plaintiff claims that he exhibited the classic warning signs of an impending stroke and that Loranger left him untreated and unaware of that risk.  Plaintiff strongly disputes that he shouldered the responsibility to follow-up with Loranger after his July 12th visit.  According to Plaintiff, Loranger should have called him to the infirmary to review the test results and

ORDER- 2

discuss future care. Decl. Vertetis, Exh. 14. Plaintiff further claims that Loranger failed to schedule either a neurological consultation or carotid ultrasound and that Loranger's refusal to take any steps toward meeting his medical needs was medically unacceptable. DeVita Decl. ¶¶ 7-9.[2] With medical attention, Plaintiff claims, his risk of stroke could have been greatly reduced. DeVita Decl. ¶ 10.

On the evening of September 11, 2001, Marcotte collapsed in his prison dormitory. Prison guards immediately transported him to the infirmary in a wheelchair where he was seen by an MCC registered nurse, Rosemary Fitzer ("Nurse Fitzer"). Vertetis Decl., Exh. 15; Bondurant Decl. ¶¶ 3, 4. Nurse Fitzer disputes that Marcotte required the assistance of MCC guards to climb on and off of the examination table. Marcotte claims that he presented to Nurse Fitzer with numbness over the entire left side of his body. Nurse Fitzer took Marcotte's pulse and blood pressure (160/90), and conducted an electrocardiogram ("EKG"), which she evaluated as normal. Taking no further medical action, Nurse Fitzer told Marcotte to drink more water, reduce his smoking, and see an infirmary doctor or physician's assistant

---

[2] Plaintiff relies on Dr. Edward DeVita to support his argument that the circumstances required MCC staff's medical intervention. DeVita Decl. at ¶¶ 8, 11. Defendants move to strike all or portions of Dr. DeVita's declaration on the grounds that his deposition is at odds with his declaration, only the latter of which includes the opinion that MCC medical staff exhibited "grossly reckless behavior." Defendants claim that this additional statement is prejudicial and that Dr. DeVita's opinion is an impermissible legal conclusion. The court does not assign legal weight to Dr. DeVita's statement in its decision, but rather looks to the underlying factual basis that informs Dr. DeVita's opinions. Defendants knew of the basis for Dr. DeVita's conclusions by the end of his deposition and thus, the court is not convinced that Defendants are prejudiced by his more recent statement. Accordingly, the court denies Defendants' request to strike Dr. DeVita's declaration.

ORDER- 3

the following morning. Defendants claim that Nurse Fitzer acted appropriately under the circumstances.[3]

Marcotte strongly disputes the adequacy of Nurse Fitzer's care. Marcotte claims that Nurse Fitzer disregarded his symptoms, ignored his relevant medical history, threatened to send him to "the hole" if he continued to fake symptoms, and forced him to return to his cell where his condition worsened. Plaintiff claims that the corrections officer on shift, Albert Bondurant, was surprised to see Marcotte return to his cell 40 minutes later, given his seriously ill appearance. Decl. Bondurant ¶¶ 3, 4.

The next morning, Plaintiff reported to prison officials that he had left-side paralysis and could not walk. He was taken to a nearby emergency room, where he was diagnosed and treated for an acute stroke. Doctors determined that an occluded right-sided carotid artery caused Marcotte's stroke, which Plaintiff notes is the same artery that Loranger detected as having an abnormal sound three months prior. As a result of his stroke, Marcotte continues to struggle with impaired motor skills and functioning. He faces a lifetime of disability.

Plaintiff brought this civil rights action under 42 U.S.C. § 1983 ("Section 1983"). Defendants move for summary judgment on several grounds. (Dkt. # 36). As a threshold matter, Defendants argue that Plaintiff has not satisfied the elements of a Section 1983 claim insofar as he names the MCC facility, the Washington State Department of Corrections

---

[3] In support of their argument that Nurse Fitzer's response was medically appropriate, Defendants cite statements by three experts: an opinion that Marcotte's symptoms were "unremarkable," Decl. Dolack at 3; a statement that Marcotte's complaints were "non-specific," Decl. Likosky at 3; and a statement that Nurse Fitzer's treatment was commensurate with her own chart notes, Vertetis Decl., Exh. 2 at 36 (Clarke Dep). No expert goes so far as to state that Nurse Fitzer's actions were medically appropriate.

ORDER- 4

("DOC") and four MCC officials, whom Defendants contend are immune from suit under the statute. In the alternative, Defendants contend that no prison official denied or delayed necessary medical treatment. Defendants also contend that no liability exists for Defendants that did not personally participate in the harm alleged. Defendants argue that, in any case, qualified immunity protects certain MCC officials from suit. Defendants also urge the court to decline supplemental jurisdiction over Plaintiff's state-law claims. Finally, in their reply, Defendants move to strike all or part of the declarations of Dr. Edward DeVita and Tim King.

### III.   DISCUSSION

In examining Defendants' motion, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

ORDER- 5

A.      **Plaintiff Has Named Four Proper Defendants Under Section 1983.**

As a threshold matter, Defendants claim that Plaintiff has failed to sue a proper Section 1983 defendant in naming the MCC facility, DOC, MCC Superintendent Robert Moore, MCC Medical Director Dr. John Kenney, Loranger, and Nurse Fitzer.  Defendants argue that DOC, as a state agency, is not a "person" and that a suit against the four MCC officials is merely a suit against the State of Washington in disguise.

To succeed on a Section 1983[4] claim, the plaintiff must establish that (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived the plaintiff of a constitutional right.  Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-1 (1986); see also L.W. v. Grubbs, 974 F.2d 119, 120 (9th Cir. 1992).  "Persons" liable for damages under Section 1983 include state employees sued in their individual capacities.  Hafer v. Melo, 502 U.S. 21, 25 (1992).  States and their agencies and state employees sued in their *official* capacities are not proper defendants under Section 1983 and therefore cannot be sued under the statute.[5]  Id. at 25-6 (citing Will v. Michigan State Police, 491 U.S. 58, 62-71 (1989)).

---

[4]Section 1983 provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983.

[5]Defendants also argue that the court must construe this as a suit against the four individual Defendants in their official capacities because all four are state employees acting within the scope of their employment.  In making this argument, Defendants confuse the capacity in which a defendant is sued (i.e. official versus individual) with the capacity in which a defendant is acting when the constitutional deprivation occurs (i.e. a private versus state actor).  Price v. Akaka, 928 F.2d 824, 828 (9th Cir. 1990).  State employees sued in their individual capacities are not immune from suit.  Hafer v. Melo, 502 U.S. 21, 27-8 (1991).  Indeed, a public employee may be individually liable precisely because of her position of authority.  Id.

ORDER- 6

1  Where a plaintiff fails to identify the capacity in which the state actor is sued, the Ninth
2  Circuit looks beyond the caption of the complaint to the "basis of the claims asserted and the
3  nature of relief sought." Price v. Akaka, 928 F.2d 824, 828 (9th Cir. 1990) (internal citations
4  and quotations omitted); see also Shoshone-Bannock Tribes v. Fish & Game Commission, 42
5  F.3d 1278, 1284 (9th Cir. 1994) (erecting presumption that Plaintiffs sued state officials in
6  their individual capacities as "any other construction would be illogical . . .").

The court is satisfied that Plaintiff has properly named four persons in their individual capacities for purposes of a Section 1983 claim: Superintendent Moore, Dr. Kenney, Loranger, and Nurse Fitzer.[6] In his complaint, Plaintiff does not state the capacity in which he sues the four individual MCC officials. Nevertheless, the court presumes that Plaintiff names all four MCC officials in their individual capacities. Any other construction would be illogical given that Plaintiff seeks relief in the form of damages, which would be precluded had Plaintiff filed an official-capacity suit. See Shoshone-Bannock Tribes, 42 F.3d at 1284. Accordingly, as to Superintendent Moore, Dr. Kenney, Loranger, and Nurse Fitzer, the court denies Defendants' motion for summary judgment for failure to name a proper Section 1983 defendant.

---

[6]Plaintiff concedes that state agencies are not proper defendants under Section 1983; therefore, the court GRANTS Defendants' motion for summary judgment on the ground that Plaintiff fails to satisfy the elements of a Section 1983 claim against the MCC facility and DOC.

ORDER- 7

**B.    Plaintiff Raises a Genuine Factual Dispute as to Whether Defendants Nurse Fitzer, Superintendent Moore and Dr. Kenney Acted With Deliberate Indifference Toward His Serious Medical Needs.**

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference includes denial, delay or intentional interference with a prisoner's medical treatment. Id. at 104-5; see also Broughton v. Cutter Labs., 622 F.2d 458, 459-60 (9th Cir. 1980) (delay of six days in treating hepatitis was sufficient to state a claim of deliberate indifference); Jones v. Johnson, 781 F.2d 769, 770-1 (9th Cir. 1986) (allegation that jail medical staff would not treat plaintiff's painful hernia until it became strangulated stated a claim against medical personnel).

To succeed on a deliberate indifference claim, an inmate must demonstrate that the prison official had a sufficiently culpable state of mind.[7] Farmer v. Brennan, 511 U.S. 825, 836 (1994) (adopting "subjective recklessness" as standard for Eighth Amendment claims); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (applying subjective state-of-mind element in medical treatment context). Deliberate indifference lies somewhere between

---

[7] Although the parties' briefing focuses on the contours of deliberate indifference, the court notes that an actionable Eighth Amendment violation also involves an objective inquiry, namely the seriousness of the inmate's medical need. McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ("A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997); see also Clement, 298 F.3d at 904 (discussing both the objective and subjective elements of an Eighth Amendment claim). A serious medical need exists if the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). The court assumes without deciding that Marcotte presented to MCC officials with a serious medical need.

ORDER- 8

negligence and "conduct engaged in for the very purposes of causing harm or with the knowledge that harm will result." Farmer, 511 U.S. at 836; see also Redman v. County of San Diego, 942 F.2d 1435, 1440 (9th Cir. 1991). Mere disagreement between an inmate and medical staff over the course of treatment does not suffice. See Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1059-60 (9th Cir. 2004). An official must (1) be actually aware of facts from which an inference could be drawn that a substantial risk of harm exists, (2) actually draw the inference, but (3) nevertheless disregard the risk to the inmate's health. Farmer, 511 U.S. at 837-8.

### 1.   **Deliberate Indifference Claim Against Loranger**

Taking the facts in the light most favorable to Marcotte, the court finds that he has not raised a genuine factual dispute as to Loranger's subjective state of mind. At bottom, the parties dispute (1) whether Loranger provided reasonable medical care when he failed to order a carotid ultrasound or schedule a neurological consultation and (2) whether it was Loranger or Marcotte who bore the responsibility to schedule a follow-up appointment after the June 12th examination. Although such disputes are certainly relevant to a malpractice claim, neither is material to a claim of deliberate indifference under the Eighth Amendment. That is, mere disagreement over the reasonableness of Loranger's diagnosis, treatment, and follow-up, without more, does not support a claim of deliberate indifference. Toguchi, 391 F.3d 1059-60. Plaintiff has not raised a factual dispute as to Loranger's state of mind and thus, Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment claim against Loranger is granted.

ORDER- 9

### 2. Deliberate Indifference Claim Against Nurse Fitzer

As to Nurse Fitzer, Marcotte has raised a genuine factual dispute as to her state of mind when she denied medical treatment altogether on the evening of September 11, 2001 and threatened Marcotte with "the hole." A reasonable jury could conclude that she knew of the substantial risk of serious harm to her patient and failed to take reasonable measures to abate that risk. Farmer, 511 U.S. at 837-8. Nurse Fitzer not only challenged the veracity of Marcotte's presentation, but made threats against him if he sought further treatment. Moreover, in the face of such an obvious and severe risk to Marcotte's health, the fact that Nurse Fitzer failed to provide any meaningful medical care that would comport with contemporary standards of decency raises a triable issue of fact regarding her subjective intent. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("poor medical treatment will at a certain point rise to the level of constitutional violation"). Lastly, where there is some indication of an unconstitutional motive, the court is mindful that a determination as to Nurse Fitzer's state of mind is a proper question for the jury. Id. at 842-3; see also McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) ("[I]t is up to the factfinder to determine whether or not the defendant was 'deliberately indifferent' . . ."), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997). Because Plaintiff has raised a factual dispute as to Nurse Fitzer's state of mind, Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment claim against Nurse Fitzer fails.

ORDER- 10

### 3. **Supervisory Liability of Superintendent Moore and Dr. Kenney**

As to Superintendent Moore and Dr. Kenney, Defendants argue that there is no respondeat superior liability under Section 1983 and that regardless, there is no causal relationship between Superintendent Moore's and Dr. Kenney's actions and Marcotte's constitutional deprivation.

Supervisory liability under Section 1983 is not vicarious; rather, it is direct. Redman v. County of San Diego, 942 F.2d 1435, 1446-7 (9th Cir. 1991). Thus, supervisory liability exists if the official implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation. Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations and quotations omitted). Likewise, a supervisor may be liable for the actions of subordinates if the supervisor had knowledge of violations and failed to act to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). To state a claim for supervisory liability, a Section 1983 plaintiff must establish a causal connection between a supervisor's act or omission and his constitutional deprivation. Johnson v. Duffy, 588 F.2d 740, 743-4 (9th Cir. 1978) (discussing the causality requirement for those defendants that do not personally participate in the constitutional deprivation). In the Eighth Amendment context, a supervisor is liable for deliberate indifference when his or her policies constitute a moving force behind an inmate's constitutional infringement. Redman, 942 F.2d at 1447-8 (holding that a supervisor could be found liable for deficient policies in response to prison overcrowding, which posed a serious safety risk to inmate personal security).

ORDER- 11

Plaintiff claims that Superintendent Moore and Dr. Kenney failed to promulgate, implement, and oversee policies and procedures necessary to provide adequate health care to MCC inmates and that this failure was deliberately indifferent. Plaintiff offers evidence of two negative reports following health department investigations in early 2001, Vertetis Decl., Exhs. 17 and 18.[8] Superintendent Moore admits to receiving these reports which contain, among other admonitions, a citation for failure to provide written policies and procedures to guide nursing staff within the infirmary. Vertetis Decl., Exh. 25 at 22. Plaintiff also offers evidence of a working environment under Dr. Kenney as one of systemic apathy and disdain toward inmates.[9] King Decl. at ¶¶ 3-6. Further, Nurse Fitzer testified at her deposition to not only the absence of training regarding MCC medical protocol, but confusion as to how to access any standing orders, policies, or procedures that would guide her decision-making. Vertetis Decl., Exh. 16 at 15-17, 20.

Construing the evidence in the light most favorable to Marcotte, there is a genuine dispute as to whether Dr. Kenney and Superintendent Moore knew or reasonably should have

---

[8] The Washington State Department of Health ("DOH") issued a Statement of Deficiencies on January 24, 2001 to the MCC relating to healthcare services. The deficiencies included, among other things: (1) failure to provide a policy and procedure manual describing nursing procedures within the infirmary unit; (2) insufficient qualified healthcare staff; and (3) poor healthcare and nursing infirmary record keeping. Vertetis Decl., Exh. 17. On February 9, 2001, DOH issued a Statement of Deficiencies which included inappropriate administration, inventory and notation of inmate medical needs. Vertetis Decl., Exh. 18.

[9] Defendants move to strike all or portions of Tim King's declaration on the grounds that King is not qualified to discuss the quality of Dr. Kenney's supervision. King's opinions are based on personal knowledge after having worked at MCC for over two years as a nurse. The court denies Defendants' request to strike King's declaration as it is unfounded and inappropriate at this stage of the proceedings.

ORDER- 12

known that their actions would cause MCC medical staff to inflict a constitutional injury. Johnson, 588 F.2d at 743. A reasonable jury could find that, in their failure to address known program deficiencies, both Superintendent Moore and Dr. Kenney acted with deliberate indifference to inmates' medical care needs. Redman, 942 F.2d at 1447-8. Specifically, Superintendent Moore and Dr. Kenney were aware of deficient infirmary nursing procedures and other health department citations and yet failed to take corrective action. Indeed, Nurse Fitzer testified to her lack of training on emergency procedures and inability to access any existing infirmary policies. City of Canton v. Harris, 489 U.S. 378, 390 (1989) (at times "the need for training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that the supervisor is said to have been deliberately indifferent). A jury could reasonably find a causal connection between Superintendent Moore's and Dr. Kenney's deficient supervision and Marcotte's constitutional injury. Accordingly, the court denies Defendants' summary judgment motion on the ground that Superintendent Moore and Dr. Kenney did not personally participate in the alleged constitutional violation.

**B. Disputed Material Facts Prevent the Court From Making a Qualified Immunity Determination.**

Defendants claim that Superintendent Moore and Dr. Kenney are entitled to qualified immunity. Qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001). The threshold inquiry in a determination of qualified immunity is whether, viewing the facts in the light most favorable to Marcotte, Dr. Kenney and Superintendent Moore ("MCC supervisors") violated Marcotte's right to medical treatment. Id. at 201; Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049

ORDER- 13

(9th Cir. 2002) (applying <u>Saucier</u> analysis in Eighth Amendment context). If MCC supervisors did not violate the Constitution, then no further inquiry would be necessary; if, however, MCC supervisors violated Marcotte's rights, then the court must query whether the constitutional right was clearly established. <u>Id</u>. A right is clearly established if a reasonable officer in Dr. Kenney's or Superintendent Moore's situation would have recognized that the conduct was unlawful. <u>Saucier</u>, 533 U.S. at 202.

In support of their qualified immunity claim as to Superintendent Moore and Dr. Kenney, Defendants incorrectly focus on the fact that the MCC supervisors were not personally involved in the medical staff's diagnostic decisions. Plaintiff does not dispute this fact; rather, Plaintiff argues that a determination on the qualified immunity question is not appropriate where triable issues of fact exist, namely whether MCC supervisors, through their policies (or lack thereof), acted with deliberate indifference toward Marcotte's medical needs.

Following <u>Saucier v. Katz</u>, "[c]ourts may not simply stop with a determination that a triable issue of fact exists . . . instead, the qualified immunity inquiry is separate . . . ." <u>Estate of Ford</u>, 301 F.3d 1043, 1053 (9th Cir. 2002). That said, because the state of mind of Dr. Kenney and Superintendent Moore constitutes an element of the constitutional claim (i.e. deliberate indifference) and remains in dispute, the court cannot say, as a matter of law, that MCC supervisors' respective conduct was the result of a reasonable mistake of fact or law. <u>Lindsey v. Shalmy</u>, 29 F.3d 1382, 1384-5 (1994) (reasoning that where the constitutional tort depends on a subjective element, it must be included in the qualified immunity equation).

The court assumes that Marcotte's allegations regarding the deliberate indifference of MCC supervisors are true, and thus, the court must conclude that no reasonable official would

ORDER- 14

have believed that such conduct was constitutionally permissible. Thus, the court denies Defendants' motion for summary judgment as to Superintendent Moore's and Dr. Kenney's qualified immunity defense.

**C.    The Court Retains Jurisdiction Over Plaintiff's State-Law Claims.**

Defendants urge the court to decline exercise of jurisdiction over Plaintiff's state-law tort claims. In its exercise of jurisdiction over pendant state-law claims, the court considers the interests of judicial economy, convenience, fairness, and comity. Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Executive Software N. Am., Inc. v. United States District Court, 24 F.3d 1545, 1557 (9th Cir. 1994). In this action, such factors weigh heavily in favor of retaining jurisdiction over state-law claims given that the court retains jurisdiction over the remaining Section 1983 claims. Accordingly, Defendants motion to dismiss Plaintiff's state-law claims is denied.

## IV.    CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 36).

Dated this 18th day of October, 2005.

JAMES L. ROBART
United States District Judge

ORDER- 15